*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

GREGORY CHAMP RIVERS,

Defendant-Appellant.

UNPUBLISHED
July 21, 2026
11:59 AM

No. 369653
Wayne Circuit Court
LC No. 11-009553-01-FC

Before: MALDONADO, P.J., and RIORDAN and YOUNG, JJ.

PER CURIAM.

Defendant, Gregory Champ Rivers, appeals as of right his December 14, 2011 bench-trial convictions of carjacking, MCL 750.529a; first-degree home invasion, MCL 750.110a(2); robbery, MCL 750.530; unlawful imprisonment, MCL 750.349b; and unlawful driving away of a motor vehicle, MCL 750.413. On February 3, 2012, Rivers was sentenced as a fourth-offense habitual offender to 30 to 60 years for carjacking, 5 to 20 years for first-degree home invasion, 4 to 15 years for robbery, 4 to 15 years for unlawful imprisonment, and two to five years for unlawful driving away of a motor vehicle, with his sentences for carjacking and first-degree home invasion to run consecutively.

On appeal, Rivers makes four arguments. First, Rivers argues that the trial court's decision to impose consecutive sentences for carjacking and first-degree home invasion was an abuse of discretion because the sentence is disproportionate. Second, Rivers argues that the trial court erred in scoring Offense Variable (OV) 4 (psychological injury to victim) at 10 points, where the evidence showed that the victim, Jessica Litinas, did not undergo continuing psychological treatment. Third, Rivers argues that the trial court erred in scoring OV 10 (exploitation of vulnerable victim) at five points based solely on the difference in physical size between Rivers and Litinas. Fourth and finally, Rivers argues that his convictions should be reversed because Litinas' in-court identification of him was the product of impermissibly suggestive pre-trial identification procedures that violated his due process rights. We agree that the trial court erred in scoring OV 4, vacate Rivers' sentence, and remand for resentencing.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

At around 11:00 a.m. on August 25, 2011, Litinas was working from her apartment in Grosse Pointe, Michigan, when she heard a door open somewhere nearby. According to Litinas, she got up to investigate and discovered a man, whom she would later identify as Rivers, standing in her kitchen. After confirming that Litinas' husband was not home, Rivers grabbed her by the wrist and said, "I just need money. Where is your money?" Rivers then noticed a purse sitting on the dining room table nearby and dragged Litinas by the wrist into the dining room, where he began rifling through the purse with his free hand. After discovering only a few dollars inside, Rivers noticed Litinas' laptop on the coffee table in an adjacent room and told her that he was going to take it. Rivers then dragged Litinas down the hallway toward her bedroom and repeated, "I'm not going to hurt you. I'm not going to hurt you." Once inside the bedroom, Rivers forced Litinas to lie down on the bed, where he bound her wrists and ankles with rope.

After grabbing some of Litinas' jewelry, Rivers left the bedroom, and she could hear him rummaging around elsewhere in the apartment. Rivers then came back to the bedroom with Litinas' keys and asked her what kind of car she drove and where it was parked. Litinas responded that she drove a 2010 Chevy Cobalt and that it was parked in the parking lot behind the apartment building. Rivers left again and, a short time later, Litinas could hear her car start up and drive away. According to Litinas, the entire encounter lasted between 10 to 15 minutes.

Litinas untied herself and returned to the living room to call the police on her cell phone, only to discover that both the phone and her laptop were gone. She then went downstairs and asked her neighbors to call the police. The police showed up within minutes. According to the trial testimony of one of the responding officers, Officer Thomas Gamicchia, he arrived at Litinas' apartment roughly 30 seconds after receiving the call from dispatch. Another responding officer, Lieutenant John Kretzschmar, testified that he had arrived at Litinas' apartment at around 11:15 a.m.[1] After receiving the license plate number on Litinas' Chevy Cobalt and a description of the car, the police broadcasted the description to nearby officers and accompanied Litinas upstairs to her apartment. She then provided the number for her missing phone and gave a description of the man who had broken in. Litinas described him to responding officers as

> fairly tall, maybe five, nine, five 10 or so, thinner build, salt and pepper hair, also wearing a blue sweat shirt, and jeans, tennis shoes. I didn't really see any scars or tattoos or anything like that that I could see because it was covered.

The sweatshirt was "just a regular pull-over" with "red writing on it," and she described the shoes as "light colored or white" or "like a dirty white."

A short time later, Officer Michael Najm radioed that he had spotted a Chevy Cobalt that matched the description and plate number given by Litinas, and Lieutenant Kretzschmar proceeded to the location given by Officer Najm. Officer Najm, meanwhile, activated his lights, maneuvered behind the Chevy Cobalt, and instructed the driver to stop over his PA. The Chevy Colbalt pulled

---

[1] The trial testimony of Officer Gamicchia and Lieutenant Kretzschmar does not make clear whether the two officers arrived at Litinas' apartment together or separately.

over, but, as Officer Najm got out of his squad car, the Chevy Cobalt sped away. Officer Najm gave chase and, at some point, the driver lost control of the Chevy Cobalt and crashed into a fire hydrant, causing the car to flip over.

When Lieutenant Kretzschmar arrived, he saw that the Chevy Cobalt had crashed and rolled onto its roof, trapping the driver inside. With the help of Officer Najm and another responding officer, Lieutenant Kretzschmar pulled the driver from the car and handcuffed him. Inside the car, Lieutenant Kretzschmar found a cell phone that he confirmed belonged to Litinas by calling the number for the missing phone given to him earlier.[2] Officer Najm placed the driver under arrest and took him down to the station for processing. On the driver's person, Officer Najm found a watch, "some jewelry, [a] couple of rings and a couple of pins and a zipper wallet that had change in it."

Litinas, meanwhile, was taken to the police station and asked to identify the perpetrator. At trial, Litinas was asked about the identification procedure used by the police at that time:

> *Q*. Okay. Did they ever do any kind of a lineup with other individuals and ask you to pick out somebody?
>
> *A*. I looked at photographs.
>
> *Q*. Oh, you did look at photographs. How many photographs?
>
> *A*. I believe it was actually only two?
>
> *Q*. Was there an attorney there at the time that you looked at the photographs, if you recall?
>
> *A*. No.
>
> *Q*. Okay. No—no lawyer that said, "I'm here for a show-up," or anything?
>
> *A*. No.
>
> *Q*. Okay. Two photos. Were they of different people?
>
> *A*. No, it was just based on my description.
>
> *Q*. Oh—oh, based on your description. But they were photos, not drawings. Am I right?
>
> *A*. An actual photograph.

_____

[2] Although a laptop was also found in the car, the prosecution does not appear to have ever connected the computer to Litinas.

*Q*. Okay. And so, they were two photos; was it of the same person?

*A*. Yes.

*Q*. And they asked you if that was the gentleman who had been in your apartment?

*A*. Yes.

Rivers' preliminary examination was originally held in early September, but the examination was adjourned for unspecified reasons until the 21st of that month. Although no testimony was taken at the first of these proceedings, Litinas would later testify at trial that she saw Rivers at the adjourned preliminary examination be escorted into the courtroom by officers while handcuffed. At the September 21, 2011 preliminary examination, Litinas positively identified Rivers as the man who had been in her apartment. At that same proceeding, Officer Najm identified Rivers as the man that had been pulled from Litinas' Chevy Cobalt. Later, at trial, Litinas again identified Rivers as the man who had been in her apartment.

At the outset of his trial, Rivers moved to suppress Litinas' identification of him. Rather than adjudicate the motion separately, the trial court proposed moving forward with the trial and allowing defense counsel to renew its motion after the relevant witnesses had testified. Rivers agreed and, after hearing testimony from Litinas, renewed his motion to suppress her in-court identification of him.

The trial court acknowledged that the identification procedure followed at the police station was incorrect; however, the salient question was "whether or not Ms. Litinas' in-court identification at trial has an independent basis." The trial court concluded that the prosecution had demonstrated by clear and convincing evidence that there was such an independent basis and permitted Litinas' in-court identification of Rivers to stand. Specifically, the trial court cited the extended duration and intimate nature of the crime, reasoning that there was a correspondingly small likelihood that Litinas would forget the perpetrator. Further, Litinas ultimately provided an accurate description of Rivers "in terms of age and height and body build, hair description."

After a bench trial at which Litinas and two officers testified for the prosecution and no witnesses testified for the defense, the trial court found Rivers guilty as charged. Specifically, Litinas called the police just moments after hearing her car start up and drive away. Officer Gamicchia, for his part, testified that he had arrived at Litinas' apartment just 30 seconds after receiving the call from dispatch and actively relayed information he received from Litinas over the radio as he received it. Litinas' Chevy Cobalt was spotted within 15 to 20 minutes of Officer Gamicchia's broadcast and, when Officer Najm attempted to stop the car, Rivers fled, a fact the trial court deemed to be evidence of consciousness of guilt. After crashing Litinas' car, Rivers was arrested, and Litinas' phone was found inside. Some of Litinas' jewelry was found in his pockets. Finally, Rivers matched Litinas' description, which the trial court concluded was "reason alone . . . to establish the identity of Mr. Rivers as the perpetrator."

The trial court sentenced Rivers on February 3, 2012, to 30 to 60 years for carjacking, 5 to 20 years for first-degree home invasion, 4 to 15 years for robbery, 4 to 15 years for unlawful imprisonment, and two to five years for unlawful driving away of a motor vehicle, with his

sentences for carjacking and first-degree home invasion to run consecutively. After years of procedural issues and the eventual restoration of Rivers' appellate rights, this appeal followed.

## II. ANALYSIS

## A. IDENTIFICATION EVIDENCE

Rivers argues that Litinas' identification of him was obtained through impermissibly suggestive procedures. Rivers contends that, because the identification lacked an independent basis, the identification procedures used violated his due process rights and therefore reversal of his convictions is warranted. We disagree.

## 1. STANDARD OF REVIEW

"The procedure used to obtain identification evidence of a witness is an important consideration under the both the state and federal Constitutions' protections of defendants' rights to due process of law." *People v Posey*, 512 Mich 317, 331; 1 NW3d 101 (2023). Whether a party has received due process is a constitutional question that we review de novo. *People v Smith*, 498 Mich 466, 475; 870 NW2d 299 (2015). "We review for clear error the trial court's factual findings in a suppression hearing, and we review de novo the constitutional matter of the trial court's application of the law to those facts." *People v Sammons*, 505 Mich 31, 41; 949 NW2d 36 (2020). "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v Blevins*, 314 Mich App 339, 348-349; 886 NW2d 456 (2016).

## 2. THE IDENTIFICATION OF RIVERS WAS SUPPORTED BY AN INDEPENDENT BASIS

"Due process protects criminal defendants against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures." *Sammons*, 505 Mich at 41 (quotation marks and citation omitted). An identification procedure is unnecessarily suggestive if a defendant is shown singly to the witness and the use of such a procedure is not necessary under the circumstances. *Id*. at 44, 46. See also *People v Gray*, 457 Mich 107, 111; 577 NW2d 92 (1998) ("[T]he exhibition of a single photograph is one of the most suggestive photographic identification procedures that can be used.").

"[I]dentification evidence stemming from a pretrial identification process that is unnecessarily suggestive may still be admissible if there is an independent basis for establishing the reliability of the identification." *Posey*, 512 Mich at 332. Eight factors are used to determine whether such an independent basis exists:

1. Prior relationship with or knowledge of the defendant.

2. The opportunity to observe the offense. This includes such factors as length of time of the observation, lighting, noise or other factor[s] affecting sensory perception and proximity to the alleged criminal act.

3. Length of time between the offense and the disputed identification.

4. Accuracy or discrepancies in the pre-lineup or show-up description and defendant's actual description.

5. Any previous proper identification or failure to identify the defendant.

6. Any identification prior to lineup or showup of another person as defendant.

7. . . .[T]he nature of the alleged offense and the physical and psychological state of the victim. In critical situations perception will become distorted and any strong emotion (as opposed to mildly emotional experiences) will affect not only what and how much we perceive, but also will affect our memory of what occurred.

Factors such as fatigue, nervous exhaustion, alcohol and drugs, and age and intelligence of the witness are obviously relevant.

8. Any idiosyncratic or special features of defendant. [*Id.* at 332-333 (quotation marks and citations omitted).]

The identification procedure used by the Grosse Pointe Park police was unnecessarily suggestive. Litinas was not shown a single photograph; she was shown two photographs. Those photographs, however, depicted a single person: Rivers. We can see no meaningful distinction between the presentation of a single photograph—a showup procedure our Supreme Court has described as "one of the most suggestive photographic identification procedures that can be used," *Gray*, 457 Mich at 111—and the presentation of multiple photographs depicting the same individual. Notably, the prosecution did not attempt to justify this identification procedure at trial and does not do so now on appeal.

Litinas' subsequent identification of Rivers at the preliminary examination was likewise unnecessarily suggestive. As Litinas testified at the September 21, 2011 preliminary examination, she had already seen Rivers at the adjourned preliminary examination earlier that month, during which he entered the courtroom in handcuffs and with police escorts. "It is hard to imagine a situation more clearly conveying the suggestion to the witness that the one presented to the witness is believed guilty by the police." *People v Werner*, 26 Mich App 109, 114; 182 NW2d 13 (1970) (holding that identification evidence resulting from an identification procedure in which the defendant was escorted by two uniformed policemen into the victim's hospital room should not have been admitted absent a showing that the victim had an independent source of identification).

The question, then, is whether Litinas' identification of Rivers had an independent basis. We hold that the trial court's decision to admit Litinas' identification of Rivers because it had an independent basis was not clearly erroneous.

The trial court began by observing that Litinas was able to observe Rivers for "a very long time." Neither of them had face coverings. In Litinas' estimation, her face-to-face conversation with Rivers in the kitchen lasted roughly 30 to 60 seconds. Rivers then grabbed Litinas by the arm and led her into the dining room, where he spent "five or so minutes" rifling through her purse. Litinas, meanwhile, was standing next to Rivers, who still had hold of her arm. Rivers then led Litinas by the arm into the bedroom, where he made her lie face down and tied her up. Although Litinas was face down, she testified that she was able to turn her head and continue to observe

Rivers as he went through the things in her bedroom.  Litinas estimated that their encounter lasted roughly 10 to 15 minutes and, for much of that time, she was able to closely observe Rivers.  Litinas recalled that it was "kind of dim" in her apartment that day; the blinds were closed and the lights were off in every room they entered.  But it was about 11:00 a.m. at the time of the incident, and Litinas testified that, because some daylight was coming in through the blinds, she did not have any difficulty seeing Rivers.

The trial court also concluded that Litinas' identification of Rivers had an independent basis because her initial description of him to Officer Gamicchia was "amazingly accurate in my view in terms of age and height and body build, hair description."  Litinas' description was indeed accurate, if somewhat generic.  For example, Litinas testified at Rivers' preliminary examination that she described him to Officer Gammicchia as "[t]all, thin, dark complected, dark brown eyes, dark hair, facial hair, . . . he was wearing a navy sweatshirt and jeans."  However, Litinas denied observing any particular or distinguishing characteristics such as scars or tattoos.[3]

We conclude that the trial court did not clearly err in finding facts that supported that there was an independent basis for Litinas' identification of Rivers.  Litinas' description was, again, accurate and, given the extended opportunity she had to closely observe Rivers, we are persuaded that the necessary independent basis for identification was present.

## B.  PROPORTIONALITY

Rivers argues that his consecutive sentences of 30 to 60 years for carjacking and 5 to 20 years for first-degree home invasion constitute a de facto life sentence given his age and poor health.  Such a sentence, Rivers contends, is disproportionate.  We disagree.

### 1.  STANDARD OF REVIEW

A trial court's sentencing decision is reviewed for abuse of discretion.  *People v Steanhouse*, 500 Mich 453, 471; 902 NW2d 327 (2017).

### 2.  RIVERS' AGE IS ALONE INSUFFICIENT TO OVERCOME THE PRESUMPTION OF PROPORTIONALITY

Criminal sentences must be reasonable.  See *People v Brcic*, ___ Mich App ___, ___; ___ NW3d ___ (2026) (stating that a "reasonableness" review "applies to both sentences within and outside the guidelines."); slip op at 10.  "[T]he proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the 'principle of proportionality' set forth in *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990), 'which

---

[3] That Litinas later described Rivers' hair and his age more accurately—after subsequent opportunities to observe him in court—by referring to his "salt and pepper hair" is not especially persuasive.  Indeed, the addition of these details, without any corroboration by either Officer Gamicchia or Lieutenant Kretzschmar as to the initial description provided underscores the need for consistent and reliable identification procedures.

requires sentences imposed by the trial court be proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *Steanhouse*, 500 Mich at 459-460.

"[A] sentencing court must determine the applicable guidelines range and take it into account when imposing a sentence." *People v Lockridge*, 498 Mich 358, 365; 870 NW2d 502 (2015). A rebuttable presumption of proportionality applies to sentences that are within the range proposed by the guidelines, and a defendant bears the burden of overcoming that presumption. *Posey*, 512 Mich at 357, 360. A defendant's age alone may be insufficient to overcome the presumption of proportionality "when considered in light of the defendant's criminal record and the gravity of their offenses." *People v Purdle*, 350 Mich App 446, 456; 32 NW3d 479 (2024).[4]

Rivers contends that, at 58 years old, his age and poor health from chronic drug use make his consecutive sentences of 30 to 60 years for carjacking and 5 to 20 years for first-degree home invasion a de facto life sentence. Such a sentence, Rivers argues, is not proportionate.

We begin by noting that Rivers' consecutive sentence of 35 years—30 years for carjacking and 5 years for first-degree home invasion—is within the guidelines' recommended range and therefore enjoys a presumption of proportionality. *Posey*, 512 Mich at 357, 360. With an OV level of 4 and a prior record variable of F, Rivers is, as a fourth-offense habitual offender, recommended to receive recommended minimum sentence of 171 to 570 months. Rivers' consecutive sentence of 35 years or 420 months is within that range.

Contrary to Rivers' assertions on appeal, his history of drug use and resulting poor health are not well documented in the record. Although Rivers' presentence investigation report notes that he had "tested positive over a dozen times from 1993 through 2009 for several drugs," Rivers expressly denied having any history of drug use or abuse when interviewed pursuant to the writing of that report. Rivers further told the investigator that "his health was good except for back pain." Nothing in the record otherwise documents Rivers' history of drug use or any related health conditions.

Rivers also has a lengthy criminal history that spans four decades and which includes, among other things, three convictions for robbery, the crime of which he has here been convicted.[5]

---

[4] Although Rivers argues that his poor health, and not just his age, should be considered when assessing the proportionality of his sentence, we nonetheless find *People v Purdle*, 350 Mich App 446; 32 NW3d 479 (2024) to be dispositive here first and foremost because, as noted below, Rivers provides no documentary support for his state of health. We also note that, although the defendant in *Purdle* did not appear to argue that, because of his poor health, his sentence was disproportionate—and although this Court therefore did not decide *Purdle* on that basis—the defendant nonetheless appears to have made such an argument in his application for leave to the Michigan Supreme Court. See *Purdle*, 516 Mich at 871 (WELCH, J., dissenting). That application was denied. *Id*. at 870.

[5] We also note that Subsection (8) of the home invasion statute, MCL 750.110a, expressly permits the imposition of a consecutive sentence for first-degree home invasion ( the trial court "may order a term of imprisonment imposed for home invasion in the first degree to be served consecutively

As for the circumstances of the present offense, the trial court emphasized that Litinas' home had been broken into in broad day light while she was there. She was then "literally tied up in her own home." Having considered both the circumstances of the offender and the offense, we conclude that Rivers' age, standing alone, does not overcome the presumption of proportionality, especially given his lengthy criminal record and the seriousness of his crimes both past and present.

B. SCORING OFFENSE VARIABLES

Rivers contends that the trial court clearly erred because Litinas' single, unspecified doctor's visit did not establish by a preponderance of the evidence that she suffered from the sort of psychological injury that warranted the scoring of OV 4 at 10 points. We agree.

1. STANDARD OF REVIEW

"Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013), superseded by statute on other grounds as stated by *People v Rodriguez*, 327 Mich App 573, 579 n 3; 935 NW2d 51 (2019). "Clear error exists if the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v Smith*, 351 Mich App 1, 9; 34 NW3d 593 (2024). " 'Preponderance of the evidence' means such evidence as, when weighed with that opposed to it, has more convincing force and the greater probability of truth." *People v Cross*, 281 Mich App 737, 740; 760 NW2d 314 (2008). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Hardy*, 494 Mich at 438.

2. THE RECORD DOES NOT SUPPORT BY A PREPONDERANCE OF THE EVIDENCE THAT LITINAS SUFFERED SERIOUS PSYCHOLOGICAL INJURY

OV 4 accounts for psychological injury to a victim and is scored 10 points when "serious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(1)(a). OV 4 is properly scored at 10 points only when serious psychological injury has in fact *occurred*, and a trial court may not assess points under OV 4 because a reasonable person *would have* suffered serious psychological injury under the circumstances. *People v White*, 501 Mich 160, 163; 905 NW2d 228 (2017).

The trial court based its scoring of OV 4 on two factual findings. First, the trial court found, based on representations made by the prosecutor, that Litinas sought psychological treatment. Second, the trial court found that the circumstances surrounding the offense warranted 10 points under OV 4, stating,

> When I look at the facts that caused the complainant in this case to seek medical or psychological counseling, this was a situation where in broad daylight her home

---

to any term of imprisonment imposed for any other criminal offense arising from the same transaction.")

was broken into when she is there. She's literally tied up in her own home. If that wouldn't drive anybody to get counseling, I don't know what will.

We don't necessarily disagree with the trial court's observation that being victimized by this type of offense "would[] drive anybody to get counseling." But that is not a sufficient factual basis to support a scoring of OV 4 by a preponderance of the evidence. Again, OV 4 is properly scored at 10 points only when serious psychological injury has in fact occurred, and a trial court may not assess points under OV 4 because a reasonable person—i.e. "anybody"—would have suffered serious psychological injury under the circumstances. *White*, 501 Mich at 163.[6]

The exclusion of the trial court's findings concerning the circumstances of the offense leaves only a receipt purporting to show that Litinas saw a doctor for psychological treatment on one occasion. That receipt does not appear in the record. Further, the transcript from Rivers' sentencing does not clearly establish that the trial court even *saw* the receipt, with the trial court stating that "*according to [the prosecutor]*, the complainant did in fact seek some treatment." (emphasis added). Regardless, defense counsel did appear to acknowledge the existence of the receipt and did confirm at least some of what it purported to show:

> [The prosecutor] did show me a receipt that the complainant had where she sought psychological treatment I believe maybe to try to get a prescription for Zantac.
>
> I'm not sure that that falls within the Offense Variable. It doesn't suggest a treatment per se. It's one doctor's visit. And unless the complainant is here to give the Court more information about the treatment she sought, I don't feel that's necessarily appropriate, your Honor.

We agree with trial counsel. Taking at face value the in-court statements about the receipt made by both the prosecution and defense counsel, we are not persuaded that the points of agreement between them are sufficient to establish by a preponderance of the evidence that Litinas in fact suffered serious psychological harm.

The parties agree only that Litinas sought psychological treatment—and possibly a prescription for Zantac—for unspecified reasons, on one occasion, at some point after her encounter with Rivers. The receipt, as characterized by the parties during sentencing, does not appear to show what led Litinas to seek psychological treatment, whether a diagnosis was made,

---

[6] We acknowledge that *People v White*, 501 Mich 160; 905 NW2d 228 (2017) was decided years after Rivers' sentencing. Therefore, the trial court's application of the reasonable person standard was, at the time of sentencing, appropriate. However, we are on direct appeal bound to apply *White*—and thus find error in the trial court's application the reasonable person standard—because "a new rule for the conduct of criminal prosecutions is the be applied retroactively to all cases, state or federal, pending on direct review or not yet final." *People v Beesley*, 337 Mich App 50, 66 n 4; 972 NW2d 294 (2021).

or whether a course of treatment was ever prescribed.[7] We do not mean to suggest that proof that treatment was sought is required. It is not. See *People v McChester*, 310 Mich App 354, 356; 873 NW2d 646 (2015), quoting MCL 777.34(2). But proof that treatment was sought was nonetheless offered here to support the assessment of points under OV 4, and that evidence falls short of establishing by a preponderance of evidence that serious psychological harm occurred.

A receipt demonstrating that psychological treatment was sought and received is sufficient to establish that serious psychological injury has occurred. *People v Davenport*, 286 Mich App 191, 200; 779 NW2d 257 (2009). In *Davenport*, this Court held that 10 points were appropriately assessed under OV 4 where the prosecutor, at sentencing, submitted a receipt for counseling services and informed the court that the victim had recently "began another series of counselings." *Id*. However, the evidence purporting to demonstrate serious psychological harm in *Davenport* was meaningfully different than the evidence that is available here. In *Davenport*, the prosecutor presented a receipt that demonstrated the victim had in fact received psychological counseling services, apparently over the course of numerous sessions. Here, in contrast, the record is ultimately murky both as to whether the receipt was ever submitted to the trial court and what information that receipt contained. At best, the receipt purportedly offered by the prosecution established Litinas sought psychological treatment on one occasion. The receipt does not establish that Litinas, like the victim in *Davenport*, was ever treated, let alone treated on multiple occasions. Again, we take care to emphasize that proof of treatment is not necessary to assess points under OV 4. See MCL 777.34(2). But the prosecution offered evidence purporting to show that treatment was sought, and an ambiguous discussion about a receipt that this court never received and the trial court may not have either does not demonstrate a serious psychological injury arising from the sentencing offense.

The trial court therefore erred in assessing 10 points under OV 4. Consequently, Rivers' total OV points would be reduced from 65 to 55 and his OV level would be reduced from IV to III. Where a defendant's sentence is based on an inaccurate calculation of the guidelines range, a defendant is entitled to resentencing. *People v Francisco*, 474 Mich 82, 92; 711 NW2d 44 (2006). We therefore vacate Rivers' sentence and remand for resentencing.[8]

---

[7] The prosecution asserted at sentencing that Litinas "advised [the prosecutor] that [Litinas] was given medication." But we can find nothing in the record to corroborate that statement, nor do we find any express mention of what that medication, in fact, was. Defense counsel *does* at one point mention "Zantac"—a heartburn medication—by which the prosecutor, on appeal, suggests defense counsel likely meant "Xanax." The inference is not unreasonable, but we cannot read into the record what is not there. We further note that defense counsel does not affirm that Litinas was *prescribed* Zantac, but rather only notes that she "tr[ied] to get a prescription for Zantac."

[8] Rivers also argues that the trial court clearly erred by scoring OV 10 at five points because the size difference between Rivers and Litinas was alone insufficient to establish by a preponderance of the evidence that she was vulnerable or that Rivers exploited that vulnerability. We do not find any error, let alone clear error in the trial court's factual findings supporting this scoring. In addition to the size differences between victim and offender, the circumstances of the offense—

-11-

## III. CONCLUSION

We affirm Rivers' convictions but vacate his sentence and remand for resentencing. We do not retain jurisdiction.

/s/ Allie Greenleaf Maldonado
/s/ Michael J. Riordan
/s/ Adrienne N. Young

---

that Litinas was, in fact, physically retrained, and that Rivers did so to steal a car, laptop, phone, and jewelry—demonstrate the requisite exploitation of a vulnerability. However, the trial court's assessment of five points for OV 10 does not alter the recommended sentencing guidelines and, given that we have ordered resentencing, the parties will be afforded the opportunity to renew these arguments at that time.